879 F.2d 459
 50 Fair Empl.Prac.Cas. 558,
51 Empl. Prac. Dec. P 39,263,
4 Indiv.Empl.Rts.Cas. 897
Vicki J. DeHORNEY, Plaintiff-Appellant,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, a
corporation; Teri Cooper, Defendants-Appellees.
 No. 84-2252.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1985.
Order and Opinion July 13, 1989.
 
 David R. Olick, Martinez, Cal., for plaintiff-appellant.
 Patricia K. Gillette, Schacter, Kristoff, Ross, Sprague & Curiala, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before BETTY B. FLETCHER, WILLIAM C. CANBY, JR. and WILLIAM A. NORRIS, Circuit Judges.
 ORDER
 The court's opinion in this case, filed on November 22, 1985, is withdrawn.
 OPINION
 PER CURIAM:
 
 
 1
 Vicki J. DeHorney appeals from a summary judgment in favor of Bank of America National Trust and Savings Association ("Bank of America") and Teri Cooper dismissing DeHorney's action seeking damages for wrongful discharge, interference with contractual relations, intentional infliction of emotional distress, and racial discrimination in violation of 42 U.S.C. Sec. 1981. We affirm.
 
 I. STATEMENT OF FACTS
 
 2
 In an appeal from summary judgment we review the facts in the light most favorable to DeHorney, the non-moving party. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).
 
 
 3
 DeHorney went to work for Bank of America on June 1, 1981, as a teller. She worked at the Treasure Island Branch and had a good work record. On February 8, 1982, a customer asked DeHorney to show him a check for $20.00 he had written which had been cashed in another branch bank. The processed check was in the file waiting to be sent to the customer. DeHorney retrieved the check. Instead of returning the check to the file after the customer looked at it, DeHorney put the check in her cash paid checks.[1] Cash paid checks are checks for which cash has been paid by the bank but which have not yet been processed.
 
 
 4
 When DeHorney made her tally for the day, it showed that she was short three dollars, indicating that she had paid out three dollars more than she had received. In reality, DeHorney was $23 short. In making her tally, she added the filing check in with the cash paid checks. The actual shortage was thus reduced by $20. Because the shortage was less than $10, the intensive inquiry into the missing funds required by bank procedures was not instigated. Such an inquiry would probably have revealed the already processed check. This inquiry, called Tell 19, not being made, the check was not discovered until a few weeks later when Elia Shafer, the agent manager of the Treasure Island Branch, was checking bank statements and noticed that one statement was short one check. Upon further inquiry, she discovered that a check had gone through the computer twice. Tracing the NCR identification number, she, with Danny Canales, the internal control officer, DeHorney's immediate supervisor, determined that DeHorney had processed the check through her cash paids.
 
 
 5
 Not knowing how to proceed, Shafer instructed Canales to talk with branch management. Armand L. Perasso, the area branch administrator, told Canales to contact the auditing department. Theresa Cooper Munz[2] ("Cooper"), an assistant auditor, was assigned to investigate. Cooper went to the Treasure Island Branch on February 24, 1982. After completing her investigation, she asked to speak to DeHorney.
 
 
 6
 During the meeting, Cooper asked DeHorney to explain how the check had been "processed twice." Not having been advised of the purpose of the meeting, DeHorney claims she was unprepared and was unable to explain. When DeHorney said that she didn't know how the check had been processed twice, Cooper said, "You are lying." DeHorney sensed that Cooper was accusing her of stealing the money. She became very upset and could only say that she had not stolen the $20. Cooper summoned Shafer to try to calm DeHorney and left the room for a short time.
 
 
 7
 When she returned, Cooper again asked DeHorney to explain the "twice processed check." DeHorney, in tears, told her that she had no explanation. Cooper asked several more times for an explanation. DeHorney continued to cry and deny any wrongdoing.
 
 
 8
 During the interrogation, Cooper said, "You people are always having problems." DeHorney responded, "Are you calling me because I'm Black?" Cooper replied, "Don't give me that goddamn bullshit."
 
 
 9
 DeHorney, in a distraught state, wrote and signed a statement which was later designed by the auditing department as a "statement of explanation." DeHorney simply wrote, "I did not still (sic) [$]20.00 out of my drawer." DeHorney finally asked if she could go home. The next day, she was notified by Shafer that she had been terminated.
 
 
 10
 During the interview, Cooper concluded that DeHorney had in fact stolen the $20. Because DeHorney had not admitted the theft, Cooper was uncertain as to the propriety of termination. She contacted Mike Mora, the personnel relations specialist, and relayed to him the situation. He assured Cooper that DeHorney could be terminated.
 
 
 11
 There is some confusion as to who actually made the decision to terminate DeHorney. Bank of America contends that the decision was made by Perasso, the area branch manager, while DeHorney insists that Cooper made the decision. Bank of America admits that the decision to terminate was based on "investigation results."
 
 
 12
 In her written report of the investigation, Cooper conveyed her version of the incident. In the brief summary, she characterized the subject of the report as "Abstraction of Customer Funds Totaling $20." Cooper stated that DeHorney "removed a $20 check form a customer's check file and negotiated it through her cash pays" (emphasis added). In the actual form which ordered DeHorney's termination, the subject was identified as "suspected negotiation of a previously cash paid check $20." The description of the irregularity, consistent with Cooper's characterization, stated that a $20 check was cash paid at a branch in Richmond, and was "again cash paid" at Treasure Island "and appeared on DeHorney's cash pay listing."
 
 II. PROCEEDINGS BELOW
 
 13
 DeHorney brought suit against the Bank of America and Cooper in California state court, alleging four causes of action: wrongful discharge, interference with contractual relations, intentional infliction of emotional distress, and racial discrimination in violation of 42 U.S.C. Sec. 1981. Bank of America and Cooper, on March 25, 1983, removed the cause to federal court pursuant to 28 U.S.C. Sec. 1446, based on the federal question raised by DeHorney's section 1981 claim.
 
 
 14
 On January 9, 1984, defendants filed a motion for summary judgment. DeHorney moved the court to abstain from deciding the California causes of action. The court granted the motion for summary judgment as to the interference with contractual relations claim. Relying on Zumbrun v. Univ. of S. Cal., 25 Cal.App.3d 1, 12, 101 Cal.Rptr. 499, 506 (1972) and Wise v. Southern Pacific Company, 223 Cal.App.2d 50, 72-73, 35 Cal.Rptr. 652, 655 (1963), the court held that "[a]gents of a corporation cannot conspire with the corporation while acting within the scope of their employment." It concluded, citing Crossen v. Foremost-McKesson, Inc., 537 F.Supp. 1076, 1080 (N.D.Cal.1982), that the "defendants are entitled to judgment as a matter of law."
 
 
 15
 The court delayed its determination on the wrongful discharge, intentional infliction of emotional distress, and racial discrimination claims pending further documentation by DeHorney. The court gave DeHorney thirty days to file supplementary documents showing (1) who was responsible for DeHorney's termination, (2) what form Bank of America used to effect the discharge, (3) Bank of America's policies and practices concerning termination, and (4) how Bank of America deviated from these policies and practices when DeHorney was terminated.
 
 
 16
 After reviewing the supplemental documents submitted by DeHorney, the court granted summary judgment on the remaining three causes of action. The court found that DeHorney had not established "that the termination was racially motivated because no evidence or inferences existed to establish a nexus between the alleged racially biased statement and the decision to terminate," and granted summary judgment as to the section 1981 claim. Finding that Bank of America had "good cause" to terminate DeHorney, in that DeHorney "had lost control of her cash paid items, a serious offense for which bank policies did permit termination even though it may have occurred through inadvertence," the court granted summary judgment on the remaining state claims. The causes were dismissed with prejudice.
 
 
 17
 DeHorney appeals the judgment as to the section 1981, interference with contractual relations, and wrongful discharge claims. She does not appeal the dismissal of her intentional infliction of emotional distress claim.
 
 III. CONTENTIONS ON APPEAL
 
 18
 DeHorney contends on appeal that (1) the action was improperly removed from state court because the federal court has exclusive jurisdiction over causes under 42 U.S.C. Sec. 1981; (2) the district court erred in not granting DeHorney's motion to abstain; (3) the district court improperly placed the burden of proof on DeHorney, the opposing party; and (4) there are genuine issues of material facts with respect to the claims of (a) interference with contractual relations; (b) wrongful discharge; and (c) the section 1981 claim.
 
 IV. JURISDICTION
 
 19
 DeHorney correctly states that the district court cannot exercise removal jurisdiction if there is no jurisdiction in the state court. Lambert Run Coal Co. v. Baltimore & Ohio R.R. Co., 258 U.S. 377, 382, 42 S.Ct. 349, 351, 66 L.Ed. 671 (1922). DeHorney argues that federal courts have exclusive jurisdiction over section 1981 claims, relying upon Valenzuela v. Kraft, Inc., 739 F.2d 434, 435 (9th Cir.1984), where this court held that the federal courts have exclusive jurisdiction over Title VII claims, 42 U.S.C. Sec. 2000e et seq. Valenzuela, however, is clearly distinguishable.
 
 
 20
 Valenzuela, 739 F.2d at 435, first recognized that Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981), provides the framework for analysis of the jurisdictional question:
 
 
 21
 In considering the propriety of state-court jurisdiction over any particular federal claim [a court should] begin [ ] with the presumption that state courts enjoy concurrent jurisdiction.... [T]he presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests.
 
 
 22
 After analyzing the applicable statutes and legislative history with respect to Title VII claims, we concluded that section 706(j), 42 U.S.C. Sec. 2000e-5(j), and 706(f)(2), Sec. 2000e-(5)(f)(2), unmistakably imply that Congress intended to accord federal courts exclusive jurisdiction over Title VII claims. Valenzuela at 435-36.
 
 
 23
 The statutes and legislative history of Section 1981 claims are not analogous to claims under Title VII. The Civil Rights Act of 1866 is the genesis of section 1981. As originally enacted, the Act granted exclusive jurisdiction to federal district courts over "all crimes and offenses committed against the provisions of this act." Act of 1866, ch. 31, Sec. 3, 14 Stat. 27.[3] The Act provided that anyone who deprived a person of a right protected by the Act would be found guilty of misdemeanor. Ch. 31, Sec. 2, 14 Stat. 27. Section 3 also contained removal provisions.
 
 
 24
 It is clear that the grant of exclusive jurisdiction under section 3 was applicable only to criminal actions arising under the Act. Moreover, this grant of exclusive jurisdiction does not appear in the current revision of the Civil Rights Act. 28 U.S.C. Sec. 1343(a) provides that federal courts shall have original, not exclusive jurisdiction; and 28 U.S.C. Sec. 1443 providing for removal of Civil Rights cases likewise does not contain any reference to exclusive jurisdiction. See Comparative Table of Civil Rights Legislation in Appendix to opinion in Georgia v. Rachel, 384 U.S. 780, 806, 86 S.Ct. 1783, 1797, 16 L.Ed.2d 925 (1966).[4]
 
 
 25
 There being no "explicit statutory directive," "unmistakable implication from legislative history," or "clear incompatibility between state court jurisdiction and federal interest," we hold that the state courts enjoy concurrent jurisdiction over section 1981 causes.
 
 V. ABSTENTION
 
 26
 Appellant claims that the district court erred in failing to rule on her motion to abstain. We agree with appellees that the order of summary judgment was tantamount to a denial of the motion. In any event, we find no merit in the motion.
 
 
 27
 The motion to abstain should be granted only in narrowly limited "special circumstances." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979). Ordinarily, the "special circumstances" must include the basic elements of the leading case, Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 498-99, 61 S.Ct. 643, 644-45, 85 L.Ed. 971 (1941). A Pullman type abstention requires that a constitutional question be involved and that "constitutional adjudication plainly can be avoided if a definitive rule on the state issue would terminate the controversy."[5] Id.
 
 
 28
 There is no federal constitutional question in this case which could be avoided by state adjudication. The district court, assuming it impliedly ruled on the motion to abstain, did not abuse its discretion in deciding not to abstain.
 
 VI. BURDEN OF PROOF
 
 29
 Appellant argues that the district court erroneously placed the burden of proof on the non-moving party.
 
 
 30
 Citing Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983), the district court held DeHorney failed to produce "specific facts" showing that there was a genuine issue for trial. Fed.R.Civ.P. 56(e). Steckl follows the well established rule with respect to the burden of proof in a summary judgment motion. The initial burden of showing the absence of a material factual issue is on the moving party. Once that burden is met, the opposing party must come forward with specific facts, and not allegations, to show that a genuine factual issue remains for trial.
 
 
 31
 We follow this rule in determining, with respect to each claim, (1) whether the evidence presented by Bank of America was sufficient to show, if uncontroverted, that there was no genuine issue of a material fact; and (2) if it was uncontroverted, whether DeHorney presented specific facts showing that there was a genuine issue for trial.
 
 VII. INTERFERENCE WITH CONTRACTUAL RELATIONS
 
 32
 DeHorney seeks recovery from Cooper for interference with contractual relations, an intentional tort. DeHorney claimed that Cooper, motivated by racial animus, intentionally manipulated the other bank employees to bring about DeHorney's dismissal. The district court first noted that DeHorney had alleged in her pleadings that everyone involved with her dismissal, including Cooper, was "at all times acting within the course and scope of such agency or employment." As noted above, citing Zumbrun v. Univ. of S. Cal., supra, and Wise v. S. Pac. Co., supra, the court stated that agents of a corporation cannot conspire with that corporation while acting within the scope of their employment and held that Cooper was entitled to judgment as a matter of law.
 
 
 33
 In holding that agents and employees cannot conspire with their corporate principal or employer when they act in their official capacity, the court said in Wise:
 
 
 34
 This rule derives from the principle that ordinarily corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract since being in a confidential relationship to the corporation their action in this respect is privileged. The inducement of the breach to be actionable must be both wrongful and unprivileged.
 
 
 35
 223 Cal.App.2d at 73, 35 Cal.Rptr. at 665.[6] See also Mayes v. Sturdy Northern Sales, Inc., 91 Cal.App.3d 69, 78, 154 Cal.Rptr. 43, 48 (1979). "One who is in a confidential relationship with a party to a contract is privileged to induce the breach of that contract." Lawless v. Brotherhood of Painters, 143 Cal.App.2d 474, 300 P.2d 159, 162 (1956). Where an employee acts within the scope of his employment, it does not matter whether his conduct in inducing the breach of contract was motivated by "ill-will or malice on his part." Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 38, 112 P.2d 631, 634 (1941).
 
 
 36
 We consider whether, in light of these rules, any of Cooper's conduct in allegedly inducing the breach was actionable. It is undisputed that Cooper was acting within the scope of her employment at all times. Thus, under California law, a confidential relationship existed between Cooper and Bank of America at the time Cooper conducted her investigation of DeHorney and when Cooper allegedly recommended that DeHorney be terminated. We conclude that, even assuming arguendo that Cooper's conduct was motivated by racial animus against DeHorney, Cooper's actions were privileged by reason of her confidential relationship with Bank of America. See id.; Wise, 223 Cal.App.2d at 73, 35 Cal.Rptr. at 665. The district court did not err in granting summary judgment to Cooper on DeHorney's claim of contractual interference.
 
 
 37
 VIII. THEORIES OF RECOVERY IN AT-WILL EMPLOYMENT CONTEXT
 
 
 38
 DeHorney contends that the district court erred in granting summary judgment to Bank of America on her claims based on termination in violation of public policy, breach of the implied covenant of good faith and fair dealing, and breach of an implied-in-fact covenant to terminate only for cause. We address each of her claims in turn.
 
 
 39
 A. Wrongful Discharge in Violation of Public Policy
 
 
 40
 Under California law, an employer may not discharge an employee if the discharge violates fundamental principles of public policy. Foley v. Interactive Corp., 47 Cal.3d 654, 669, 254 Cal.Rptr. 211, 214, 765 P.2d 373, 376 (1988). Discharges which have been found to offend public policy include discharge for refusal to commit perjury; discharge for union membership and activity; discharge for serving on a jury; discharge for filing a worker's compensation claim; and discharge for reporting violations of consumer protection laws. Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 172, 164 Cal.Rptr. 839, 842, 610 P.2d 1330, 1333 (1980) (collecting cases). DeHorney claims that she was discharged because of Bank of America's racial animus against her and that such action violates basic public policy. As discussed in Section IX, infra, however, DeHorney's failure to make a prima facie case of racial discrimination disposes of this claim as well. Accordingly, we affirm the district court's decision rejecting her claim against Bank of America for termination in violation of public policy.
 
 
 41
 B. Implied Covenant of Good Faith and Fair Dealing
 
 
 42
 The employment agreement that DeHorney signed contained the following provisions explaining the parties' obligations and expectations in the event of termination of the employment agreement:
 
 
 43
 7. I recognize that I shall not become a permanent employee of the Bank until a conclusion of a trial period, which shall not exceed three months (90 days), and that during such trial period, I may be released with or without cause and shall be entitled only to my salary at the agreed upon rate to the date of release.
 
 
 44
 8. If I attain permanent status after the trial period mentioned in Paragraph 7, my date of employment shall nevertheless be the date on which I originally reported for work, and thereafter I shall be entitled to two weeks' notice or one-half month's salary in lieu thereof in case of dismissal unless such dismissal results from my dishonesty, disloyalty, insubordination or other good cause.
 
 
 45
 The district court interpreted these provisions as creating an at-will employment contract. We agree. Section 8 is unmistakably clear that "permanent employees" are not in fact permanent, but are only entitled to certain benefits upon termination, depending on whether they are dismissed for cause or without cause. Section 8 explains that an employee who is dismissed without cause is entitled to notice and severance pay, while an employee terminated for "dishonesty, disloyalty, insubordination or other good cause" is not entitled to those benefits. Thus, when DeHorney signed the contract, she agreed that Bank of America could terminate her with or without cause, so long as the bank complied with the notice and severance provisions set forth in Section 8 of the contract.
 
 
 46
 Despite the terms of her employment contract with Bank of America, DeHorney contends that the covenant of good faith and fair dealing which is implied into every contract under California law prohibits Bank of America from terminating her without good cause. As Foley makes clear, however, the implied covenant of good faith and fair dealing cannot be invoked to contradict an agreement between the parties that the employment contract is terminable at the will of either party. Although the court reaffirmed that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," 47 Cal.3d at 683, 254 Cal.Rptr. at 227, 765 P.2d at 389 (quoting Rest.2d Contracts, Sec. 205), it rejected the argument that an employee could invoke the implied covenant of good faith to prevent an employer from terminating an at-will contract. As the court explained:
 
 
 47
 [W]ith regard to an at-will employment relationship, breach of the implied covenant cannot logically be based on a claim that a discharge was made without good cause. If such an interpretation applied, then all at-will contracts would be transmuted into contracts requiring good cause for termination.... Because the implied covenant protects only the parties' right to receive the benefit of their agreement, and, in an at-will relationship there is no agreement to terminate only for good cause, the implied covenant standing alone cannot be read to impose such a duty.
 
 
 48
 Id. at 698 n. 39, 254 Cal.Rptr. at 238 n. 39, 765 P.2d at 400 n. 39.
 
 
 49
 In sum, Foley settles California law that when parties have agreed that their contract is terminable at the will of either of them, as is the case here, the implied covenant of good faith and fair dealing cannot be invoked by either party to prevent a court from enforcing the terms of the contract.
 
 
 50
 Accordingly, we hold that the district court properly awarded summary judgment to Bank of America on DeHorney's claim for breach of the implied covenant of good faith and fair dealing.
 
 
 51
 C. Implied-in-fact Covenant to Terminate Only for Cause
 
 
 52
 Finally, we consider DeHorney's claim that her written at-will contact with Bank of America was modified by a later implied-in-fact contract to terminate only for just cause. DeHorney argues that Bank of America by its own conduct modified the terms of her employment, and she points to the bank's Code of Corporate Conduct, which promised "all employees fair treatment, good career opportunities, and attractive working conditions." DeHorney also singles out a provision in the Code which states that an employee would be discharged "whenever such action is justified" as evidence of an implied-in-fact contract to terminate only for cause.
 
 
 53
 In Foley, the California Supreme Court observed that a few recent California cases "can be interpreted to preclude enforcement of an implied-in-fact modification of an ongoing employment agreement when some express written provision insists on the employee's at-will status." 47 Cal.3d at 680 n. 23, 254 Cal.Rptr. at 225 n. 23, 765 P.2d at 387 n. 23. In this regard, the California Supreme Court cited Shapiro v. Wells Fargo Realty Advisors, 152 Cal.App.3d 467, 482, 199 Cal.Rptr. 613, 621-22 (1984), which held that an employee could not use oral promises and an employees' benefits manual to establish an implied-in-fact contract to terminate only for cause when the original employment agreement clearly defined the relationship as employment at-will. The employee there "could not have reasonably relied on any implied promise by Wells Fargo which contradicted the express provisions of the written [employment] agreement which he signed." Id. at 482, 199 Cal.Rptr. at 622.
 
 
 54
 As we interpret and apply Shapiro to the facts of this case, we hold that DeHorney could not have reasonably believed that Bank of America's personnel policies modified the clear terms of her employment contract creating employment at-will. Because we hold on the facts of this case that DeHorney has not raised a triable issue of fact as to the existence of an implied-in-fact contract modifying the original agreement, we need not decide the question that was left unanswered by the Court in Foley: namely, whether an express at-will employment agreement can ever be modified by an implied-in-fact contract to terminate only for cause. See Foley, 47 Cal.3d at 680 n. 23, 254 Cal.Rptr. at 225 n. 23, 765 P.2d at 387 n. 23.
 
 IX. SECTION 1981 CLAIM
 
 55
 In a section 1981 case, the plaintiff must establish a prima facie case of disparate treatment. The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reasons for the discharge. If the defendant carries this burden, the plaintiff must then have an opportunity to show the reasons offered by the defendant were not the true reasons, but were a pretext for discrimination. The plaintiff retains the ultimate burden of persuasion. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (employment discrimination claim under 42 U.S.C. Sec. 2000e et seq.)[7] Moreover, to establish a Sec. 1981 claim, the plaintiff must prove intentional or purposeful discrimination. General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 383-391, 102 S.Ct. 3141, 3146-3150, 73 L.Ed.2d 835 (1982).
 
 
 56
 In an order entered on March 21, 1984, the district court found that the only evidence of any racial motivation in DeHorney's dismissal was "the somewhat ambiguous" reference to "you people" made by Cooper.[8] Shafer testified that she thought Cooper was referring to military people. The court found further that even if Cooper did express racial animus toward DeHorney, plaintiff had not shown that Cooper was responsible for the termination. The defendants claimed that DeHorney was fired by Perasso, supporting that claim with Exhibit A-18, a form signed by Perasso's secretary. The court stated further that it was obvious that Cooper's internal investigation data report was not the form by which DeHorney was terminated and that absent some showing that Cooper's involvement was more than that of an investigator whose report to the ultimate decision maker was not tainted with racial bias, DeHorney could not show that the termination was racially motivated.
 
 
 57
 The court gave DeHorney an opportunity to present additional evidence with respect to who was responsible for DeHorney's termination. Following further discovery, the court in its order of June 22, 1984, said in part:
 
 
 58
 The investigator, Cooper-Munz, telephonically relayed the results of her investigation to her superior, personnel, and to branch administrator, Perasso. (Exhibit # 3, Defendants' Reply, June 6, 1984). As a result of the investigation, plaintiff was terminated by branch personnel pursuant to Perasso's order. (Deposition Shafer). The next day Cooper-Munz completed her written report on a seldom used form which identified the irregularity and that plaintiff was terminated. (Exhibit # 1, Plaintiff's Opposition, May 18, 1984). The actual form which ordered plaintiff's termination originated from Perasso's office and cited the audit investigation as the cause. (Exhibit A-19). Perasso was unfamiliar with plaintiff and presently has no recollection of the events surrounding the termination, (Deposition of Perasso), although the testimony of his secretary Martin confirms his involvement. Finally, Cooper-Munz admits she may have made a recommendation to someone favoring plaintiff's termination. (Deposition of Cooper-Munz, p. 82).
 
 
 59
 The evidence, at most, showed Cooper-Munz reported the results of her investigation to the ultimate decision maker. There is no evidence Cooper-Munz reported or even suggested plaintiff's race to anyone else. Perasso was in a different physical location from plaintiff and there is no evidence he has any knowledge of her race. Even by inference plaintiff cannot establish that the termination was racially motivated because no evidence or inferences existed to establish a nexus between the alleged racially biased statements and the decision to terminate. If Cooper-Munz recommended termination to Perasso, that alone would not rise to substantial involvement in the decision. No evidence or inferences were presented to show that Perasso's decision was racially motivated or even that Cooper-Munz conveyed her alleged prejudicial comments to him.
 
 
 60
 In order to establish a prima facie case, DeHorney was required to show that race, more likely than not, was a factor in her termination. The uncontroverted evidence shows that Cooper was the only person in any way involved in the termination decision who even knew that DeHorney was black. There is no evidence that Bank of America took DeHorney's race into consideration in making the decision to terminate her employment. DeHorney's contention that Cooper, rather than Perasso, made the decision to discharge her is pure speculation.[9] We agree with the district court that DeHorney failed to establish a nexus between the alleged racial slur and the decision to terminate. There is no proof of intentional or purposeful discrimination.
 
 X. CONCLUSION
 
 61
 We conclude that (1) the action was properly removed from state court; (2) the district court did not err in denying appellant's motion to abstain; and (3) the court properly granted appellees' motion for summary judgment with respect to all of DeHorney's claims.
 
 
 62
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Apparently, DeHorney did not provide the Bank of America with this explanation until after she was terminated. In the "Declaration of Vicki J. DeHorney in Opposition to Motion for Summary Judgment," after describing her termination, she stated: "The check was a $20.00 check on the account of Mr. Everett Jones. I knew Mr. Jones personally, and I had occasion after these events to see him on the base, and he helped me construct what apparently happened."
 
 
 [2]
 The order of the district court refers to this defendant as Theresa Cooper Munz. In the title to the action and briefs of both parties, she is referred to as Teri Cooper, the name we use in this opinion
 
 
 [3]
 A similar provision appeared in the Civil Rights Act of 1875, ch. 114, Sec. 3, 18 Stat. 335, 336
 
 
 [4]
 See also Martinez v. California, 444 U.S. 277, 283 n. 7, 100 S.Ct. 553, 558 n. 7, 62 L.Ed.2d 481 (1980), where the Supreme Court held that state courts have concurrent jurisdiction over section 1983 claims
 
 
 [5]
 See also Canton v. Spokane School District # 81, 498 F.2d 840, 845-46 (9th Cir.1974); L.H. v. Jamieson, 643 F.2d 1351, 1354-55 (9th Cir.1981), and other Ninth Circuit cases there cited
 
 
 [6]
 We do not agree with appellee that a conspiracy claim is a prerequisite to a contractual interference claim. In Zumbrun, the court stated, "No cause of action exists for a conspiracy itself; the pleaded facts must show something which, without the conspiracy, would give rise to a cause of action." Zumbrun, 25 Cal.App.3d at 12, 101 Cal.Rptr. at 506. The conspiracy claim "merely gives a right to the injured person to hold each of the parties to the conspiracy responsible for the wrongful acts of [all the conspirators.]" Price v. Hibbs, 225 Cal.App.2d 209, 37 Cal.Rptr. 270, 278 (1964)
 
 
 [7]
 See also United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 712, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (claim of employment discrimination brought under 42 U.S.C. Sec. 2000e et seq.); Davis v. County of Los Angeles, 566 F.2d 1334, 1340 (9th Cir.1977) (Title VII, 42 U.S.C. Sec. 2000e et seq., principles are used as a benchmark in section 1981 causes), vacated on other grounds, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)
 
 
 [8]
 DeHorney testified as follows regarding the alleged racial slur:
 Q: Is this when Teri used the phrase, "You people"?
 A: Well, I can't remember the whole conversation, but I do remember this one. She said, "You people are always having problems." And I said, "What do you mean, blacks?" And this is when she cursed at me.
 Q: What did she say?
 A: She said, "Don't give me that goddam bullshit."
 Q: Did she say anything else?
 A: As far as continuing to call me a liar and she says "People have problems, sometimes, and they need a little extra money."
 Cooper denied making the statement.
 
 
 [9]
 In her reply brief, DeHorney admits that "the facts giving rise to the inference of racial animus on the part of Cooper are not of enormous magnitude," but argues that when considered in the light of all remaining facts and circumstances, there is a triable issue of fact. DeHorney does not attempt to show how these facts prove racial discrimination in the decision to terminate her employment