**Mary Lou SIDDOWAY, Plaintiff,**

**v.**

**BANK OF AMERICA, et al.,
Defendants.**

**No. C–90–1180 WHO(FJW).**

United States District Court,
N.D. California.

Oct. 17, 1990.

Patricia K. Gillette, William J. Carroll and James F. Flanagan of Heller, Ehrman, White & McAuliffe, and Jay J. Price, Office of the General Counsel of the Bank of America, San Francisco, Cal., for defendants and moving parties.

Roy F. Harris, Santa Rosa, Cal., for plaintiff and responding party.

## MEMORANDUM OF OPINION AND ORDER GRANTING SUMMARY JUDGMENT

FREDERICK J. WOELFLEN, Chief United States Magistrate.

This is a civil action for wrongful discharge arising under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 and 1140. This action was filed in Superior Court in Sonoma, and was removed to federal court by defendants in April, 1990. Plaintiff Mary Lou Siddoway alleges four causes of action against defendants Bank of America ("Bank") and two of her former supervisors: breach of contract, intentional infliction of emotional distress, interference with contractual relations, and breach of the implied covenant of good faith and fair dealing. On May 11, 1990 the parties consented to proceed to trial before a United States Magistrate. On September 7, 1990 defendants filed their motion for summary judgment, or in the alternative, summary adjudication.

### FACTS

From February 1971 until May 1989, plaintiff was employed by Bank of America in various capacities, beginning as a Teller. In April 1979 plaintiff became an authorized officer of the Bank in the position of Assistant Operations officer. In May 1983 plaintiff transferred to the Bank's Petaluma branch. Plaintiff became a Section Manager–Branch Operations on March 1, 1987 and remained in this position until she left the Bank in May 1989.

Shortly after plaintiff began working at the Petaluma branch, Mr. Harry Kimball became branch manager. Ms. Sherry Kuntz transferred to the Petaluma branch in September 1987, filling the position of Manager–Branch Operations. Plaintiff was among the employees who reported directly to Ms. Kuntz. Both Mr. Kimball and Ms. Kuntz have been named as individual defendants in the complaint.

Plaintiff has testified that the alleged harassment against her began in March 1988, after she declined a suggestion by

Ms. Kuntz that she take early retirement at a sum of $18,000. Plaintiff, who was 59 at the time, apparently intended to retire sometime late in 1990, after she turned 62. Plaintiff claims that after her refusal to retire she became the subject of unwarranted harassment and intimidation by her superiors, which took the form of criticisms of her work performance, being given additional job responsibilities, and conflict with her supervisors. She was also placed on a 90 day probation period and repeatedly threatened with termination if she did not improve certain areas of her performance.

Plaintiff has testified that, as a result of this harassment, she experienced an increasing degree of emotional distress. In December of 1988, plaintiff began seeing a psychologist for her symptoms, who subsequently recommended that plaintiff go on medical leave of absence for three months. In early February of 1989, the psychologist wrote a letter to Ms. Kuntz requesting such leave, and plaintiff was placed on medical leave and commenced her receipt of disability payments. Plaintiff claims that it was her understanding at that time that in order to qualify for additional leave she would have to be confined to a mental hospital, although no such condition is provided in the Bank's literature regarding medical leave.

At the end of her 90 day leave plaintiff felt that she could not return to the Bank and, the day before her state disability payments expired, she sent a letter to Ms. Kuntz resigning from her job. Ms. Kuntz responded with a letter urging plaintiff to reconsider her decision and offering her the opportunity to rescind her resignation. Plaintiff did not respond to this letter and her resignation became effective.

## STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), a summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If the movant satisfies his initial burden of demonstrating the absence of a genuine issue of fact, the burden then shifts to the opponent to come forward with *specific* facts showing that there remains a genuine issue for trial. *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir.1979) (citing Fed.R.Civ.P. 56(e)), *cert. den., Ruffin v. County of Los Angeles*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980). The evidence offered in opposition to the motion for summary judgment must be "significantly probative as to any fact claimed to be dispositive." *Id.* (citations omitted). " 'Where it is clear from the evidence presented at the hearing on a motion for summary judgment that the movant would be entitled to a directed verdict were the case to proceed to trial,' summary judgment ordinarily should be granted." *Id.* (citation omitted).

## DISCUSSION

In her complaint, plaintiff alleges four causes of action arising out of the termination of her employment with the Bank: 1) breach of contract, against the Bank; 2) intentional infliction of emotional distress, against her superiors; 3) interference with contract, against her superiors; and 4) breach of the covenant of good faith and fair dealing, against the Bank.

## I. THE CONTRACT–RELATED CLAIMS

Defendants argue that plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, and her tort claim for interference with contractual relations each rest upon the premise that plaintiff was "wrongfully discharged" from her employment with the Bank. Defendants contend that plaintiff was neither actively nor constructively discharged, and thus cannot prove that her contract was breached.

### A. *Can plaintiff's resignation be viewed as a constructive discharge?*

Under both California and federal law, a constructive discharge occurs when "an employer deliberately causes or allows the employee's working conditions to become so intolerable that the employee is forced

into an involuntary resignation." *Zilmer v. Carnation Co.*, 215 Cal.App.3d 29, 38, 263 Cal.Rptr. 422 (1989), *review den.; see also, Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 473 (8th Cir.1990); *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). In order to prove constructive discharge, a plaintiff must prove that his employer "breached an implied [or express] promise not to discharge him without good cause by forcing him to submit to intolerable working conditions which foreseeably and proximately caused his resignation." *Panopulos v. Westinghouse Elec. Corp.*, 216 Cal.App.3d 660, 667, 264 Cal.Rptr. 810 (1989), *review den.*

Defendants argue that nothing in plaintiff's deposition testimony or the facts suggest that plaintiff's circumstances at the time of her resignation were intolerable. Plaintiff had been away on medical leave for three months at the time she resigned, and she could have requested an extension of her leave, rather than resign. Alternatively, plaintiff could have elected to return to work. Having foregone these options, defendants maintain that plaintiff cannot now claim that she faced intolerable conditions and was forced to resign.

If plaintiff was not constructively discharged, defendants contend that each of plaintiff's contract-related claims must fail because the contract damages claimed flow exclusively from that discharge.

Plaintiff does not address this argument in her opposition papers and thus has presented no specific facts showing that there remains a genuine issue for trial. However, assuming *arguendo* that a triable issue of fact exists as to whether defendants engaged in behavior which would lead a reasonable person to resign, this issue is rendered moot by virtue of the analysis set forth below.

B. *Did plaintiff have a contractual right to continuing employment?*

■ Assuming plaintiff did have a constructive discharge claim, defendants argue that she cannot prove the existence of a contractual right to continuing employment with termination for good cause only. Under California Labor Code § 2922 em-

ployment which has no specified term may be terminated at the will of either party on notice to the other. Under the holding of the California Supreme Court in *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988), because of this statutory presumption of at-will status, the employee must show the existence of an express or implied contract rebutting the presumption of at-will employment and must produce evidence that her termination violated the contract.

■ In this case, defendants have presented to the court the Agreement of Employment with the Bank which plaintiff signed in 1971 when she first became a Bank employee, which sets forth specific provisions governing termination. In part, the contract provides that the Bank reserves the right to terminate plaintiff's employment, regardless of the existence of good cause, as long as it furnishes two weeks' notice, or pay in lieu thereof. In particular, sections 7 and 8 of the Employment Agreement provide:

"In consideration of my employment by the BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, hereinafter called BANK, I hereby agree to the following terms and conditions ...

7. I recognize that I shall not become a permanent employee of the BANK until conclusion of a trial period, which shall not exceed three months (90 days), and that during such trial period, *I may be released with or without cause without notice* and shall then be entitled to my salary at the agreed upon rate to the date of release.

8. If I attain permanent status after the trial period.... *I shall be entitled to two weeks' notice or one-half month's salary in lieu thereof in case of dismissal unless such dismissal results from my dishonesty, disloyalty, insubordination or other good cause.*" (emphasis added)

Defendants contend that this written Agreement of Employment is dispositive with respect to the Bank's right to terminate plaintiff's employment, and that the existence of this Agreement precludes the implication of any agreement to the con-

trary. Plaintiff has offered no rebuttal to this argument in her opposition papers.

The very same provisions of this Agreement were addressed by the Ninth Circuit in the case of *DeHorney v. Bank of America Nat. Trust & Sav. Ass'n*, 879 F.2d 459 (9th Cir.1989). In that case, the district court of the Northern District of California found that, by virtue of such language, a teller who was fired from the Bank of America did not have a contractual right to continuing employment absent good cause. The court thus granted summary judgment to the defendant Bank on plaintiff's claim of a breach of the implied covenant of good faith and fair dealing. The Ninth Circuit affirmed, holding:

> "[S]ection 8 is unmistakably clear that 'permanent employees' are not in fact permanent, but are only entitled to certain benefits upon termination, depending on whether they are dismissed for cause or without cause. Thus, when [plaintiff] signed the contract, she agreed that Bank of America could terminate her with or without cause, so long as the bank complied with the notice and severance provisions set forth in section 8 of the contract." 879 F.2d at 465.

Thus, following the lead of the Ninth Circuit in *DeHorney*, these provisions of plaintiff's employment agreement create an at-will employment contract, and hence no express contract existed which entitled plaintiff to continuing employment absent good cause. Accordingly, we find that defendants are entitled to summary judgment on plaintiff's claim of breach of contract.

### C. *Breach of the covenant of good faith and fair dealing*

■ Under California law, the covenant of good faith and fair dealing obliges the parties to a contract to discharge contractual obligations fairly and in good faith, and it is implied into every contract. *Foley v. Interactive Corp.*, 47 Cal.3d at 683, 254 Cal.Rptr. 211, 765 P.2d 373 (citations omitted). Defendants maintain that California courts have refused to find a breach of the covenant of good faith and fair dealing where the relationship between the employee and the employer is at will.

Plaintiff offers no opposition to this argument.

As with the issue of breach of contract, the *DeHorney* Court also addressed this issue head on, holding that "[i]n sum, *Foley* settles California law that when parties have agreed that their contract is terminable at the will of either of them, as is the case here, the implied covenant of good faith and fair dealing cannot be invoked by either party to prevent a court from enforcing the terms of the contract." The district court's grant of summary judgment to the Bank was thus affirmed.

Accordingly, we find, consistent with *DeHorney*, that defendants must be granted summary judgment as to plaintiff's cause of action for breach of the covenant of good faith and fair dealing.

### D. *Intentional interference with contractual relations*

■ The tort of intentional interference with contractual relations may be maintained only against those without a privilege to induce one party to breach a contract with another. One who is given a legal privilege to induce a breach is immune from any intentional interference claim. *DeHorney*, 879 F.2d 459 (9th Cir. 1989); *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321 (9th Cir.1982); *Marin v. Jacuzzi*, 224 Cal.App.2d 549, 36 Cal.Rptr. 880 (1964); *Wise v. S. Pac. Co.*, 223 Cal.App.2d 50, 35 Cal.Rptr. 652 (1963). California law provides that a supervisor or managerial employee is privileged to induce the breach of an employment contract or otherwise interfere with business or economic relations on behalf of his employer. *See DeHorney* at 464, citing *Zumbrun v. Univ. of Southern California*, 25 Cal.App.3d 1, 12, 101 Cal.Rptr. 499 (1972); *Lawless v. Brotherhood of Painters, etc.*, 143 Cal.App.2d 474, 300 P.2d 159 (1956). "Where an employee acts within the scope of his employment, it does not matter whether his conduct in inducing the breach of contract was motivated by 'ill-will or malice on his part.'" *DeHorney* at 464, citing *Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 38, 112 P.2d 631 (1941).

Defendants argue that the defendant supervisors Kuntz and Kimball are shielded from liability by the privilege of managerial immunity. Plaintiff does not rebut this claim in her opposition.

In the *DeHorney* case, the district court granted summary judgment on behalf of the defendant bank investigator who instigated the plaintiff's termination as to plaintiff's claim of intentional interference with contractual relations. The court held that under California law, agents of a corporation cannot conspire with that corporation while acting within the scope of their employment, and thus the investigator was entitled to judgment as a matter of law. *DeHorney* at 464.

The Ninth Circuit affirmed, finding that under California law a confidential relationship existed between the investigator and the Bank at the time of the investigation and when the investigator recommended that DeHorney be terminated. The Court concluded that the investigator's actions were privileged, even assuming *arguendo* that they were motivated by racial animus against the plaintiff. *Id.* at 465.

■ Thus, we find that the defendant supervisors in the case at bar are shielded from liability by this same privilege of managerial immunity. Accordingly, even were plaintiff to state a claim for constructive discharge, she may not recover against Kimball and Kuntz for actions which allegedly led to such, and summary judgment is granted as to plaintiff's claim of interference with contractual relations.

E. *Are plaintiff's claims preempted and barred by the National Bank Act?*

■ Defendants contend that even if plaintiff could prove that she was constructively discharged from the Bank, any claims asserted in connection with that discharge would fail because they are preempted under the terms of the National Bank Act ("NBA"). Under the NBA, the Bank's power to dismiss officers such as Siddoway is controlled by the Act, which provides that the Bank may dismiss officers at pleasure. Thus, upon complying with certain requirements, a national bank may dismiss any officer without incurring liability for breach of contract or tort.

Because we have found that the Bank had the authority to dismiss plaintiff at-will under the terms of her employment agreement, we find no need to address the merits of the NBA at this time.

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Plaintiff has also claimed tort liability on behalf of the defendants for intentional infliction of emotional distress.

A. *Is plaintiff's claim for intentional infliction of emotional distress preempted by the California Worker's Compensation Act?*

Defendants claim that any remedy for plaintiff's claim of intentional infliction of emotional distress lies within the California Worker's Compensation system because the Worker's Compensation statute provides the exclusive remedy for such injuries. In the case of *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 233 Cal. Rptr. 308, 729 P.2d 743 (1987), the California Supreme Court held that:

"[W]hen the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering *emotional distress causing disability* may not avoid the exclusive remedy provisions of the Labor Code ..." Id. at 160, 233 Cal.Rptr. 308, 729 P.2d 743. (emphasis added)

Defendants maintain that this pertains to both physical complications arising from the stress and purely emotional claims. Plaintiff argues that in cases where no physical injury or disability is alleged, a civil claim for emotional distress is not barred by the Worker's Compensation Act. Here, plaintiff has alleged physical symptoms as a result of her emotional distress, but contends that these are of the type which do not go to the heart of the action. Instead, the thrust of the case is that plain-

tiff was singled out for disparate treatment amounting to psychological harassment.

Prior to the *Cole* case, cited above, a line of cases had developed in the California Courts of Appeal wherein a tort action was allowed where there was no physical injury or disability. The theory of these cases was that the employee had no substantial remedy under Worker's Compensation law. 2 Witkin, *Workers' Compensation* § 53 (9th ed.1987). The courts refused to extend this theory to cases where there was substantial physical injury and disability compensable under Worker's Compensation laws. *Id.* In *Cole*, the California Supreme Court did not expressly overrule these cases. Rather, it recognized the anomaly of pure emotional distress cases in the law. The language of the *Cole* case states that a plaintiff claiming "emotional distress causing disability" may not avoid the Worker's Compensation statute. *Id.* at 160, 233 Cal. Rptr. 308, 729 P.2d 743.

Defendants contend that plaintiff has claimed disability by virtue of her allegations of physical ailments (spastic colon, etc. ...) from the stress, and by virtue of the fact that she was "disabled" enough by the stress to have to leave work. Defendants also rely on Worker's Compensation cases which were brought before the Worker's Compensation board for pure emotional distress.

Plaintiff, however, cites cases which acknowledge that claims of physical ailment which accompany a claim for emotional distress, but which do not claim employment disability, may sound in tort where "the gravamen of [the] complaint remains emotional harm." *Iverson v. Atlas Pac. Engineering,* 143 Cal.App.3d 219, 230, 191 Cal. Rptr. 696 (1983).

Assuming *arguendo* that plaintiff's claim for emotional distress is not barred by Worker's Compensation laws, in order to prevail on her claim she must show that conduct which was directed at her was "outrageous", i.e., conduct that goes beyond merely ordinary tortious conduct and is a "great departure from everyday life." *Ankeny v. Lockheed Missiles and Space Co.,* 88 Cal.App.3d 531, 536, 151 Cal.Rptr. 828 (1979); *Cornblith v. First Mainte-* *nance Supply Co.,* 268 Cal.App.2d 564, 565, 74 Cal.Rptr. 216 (1968); *Inglis v. Feinerman,* 114 LRRM 3477 (N.D.Cal.1982), *aff'd,* 701 F.2d 97 (9th Cir.1983), *cert. den., Inglis v. Feinerman,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

**B.  *Can plaintiff prove outrageous conduct?***

Defendants argue that even if plaintiff's emotional distress claim is not preempted, that claim must fail for lack of proof of outrageous conduct. Plaintiff, on the other hand, argues that circumstances determine what is "outrageous conduct", and that what she was subjected to meets that standard. For support, plaintiff cites the cases of *Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970), and *Rulon–Miller v. International Business Machines Corp.,* 162 Cal.App.3d 241, 208 Cal.Rptr. 524 (1984). In the *Alcorn* case, the court found outrageous conduct existed where the employer used racial epithets and other derogatory conduct directed toward the plaintiff. In *Rulon–Miller,* the plaintiff was fired after her employer forced her to choose between her job and her lover, who worked for a competitor. The court found outrageous conduct not only by virtue of the fact that the plaintiff had been forced to choose between her personal relationship and work, but also because of the manner in which the discharge was conducted. 162 Cal.App.3d at 255, 208 Cal.Rptr. 524.

Defendants cite cases wherein conduct was found not to rise to the level of outrageousness necessary to trigger tort liability, even though such conduct might rise to the level of illegal discrimination. *See e.g., Paroline v. Unisys Corp.,* 879 F.2d 100 (4th Cir.1989), *vacated, in part, en banc,* 900 F.2d 27 (4th Cir.1990); *Sherman v. Prudential–Bache Secur., Inc.,* 732 F.Supp. 541 (E.D.Pa.1989). *See also, Yurick v. Superior Court,* 209 Cal.App.3d 1116, 257 Cal.Rptr. 665 (1989); *Cornblith v. First Maintenance Supply Co.,* 268 Cal. App.2d 564, 74 Cal.Rptr. 216 (1968).

Plaintiff's affidavit, filed with her opposition to defendants' motion for summary

judgment, sets forth the following facts which provide the basis of her claim for emotional distress:

7. Beginning in approximately March, 1988, I was subjected to a program of harassment and intimidation including:

a. I was reprimanded for being late to a meeting when my lateness was caused by being unavoidably detained on other company business.

b. I was reprimanded (written up) for conduct that was condoned in my peers.

c. When I declined early retirement, Ms. Kuntz said she would find more work for me to do; and I was assigned additional minor, but time-consuming, detailed tasks.

d. When I became aware that I was being singled out—persecuted—I became fearful for my job and was extremely nervous, and made far more errors than I had in any prior similar period of employment.

e. In desperation, I requested and was granted ninety days disability leave. It was my understanding at that time, that in order to qualify for additional leave, I would have to be confined to a mental hospital.

f. At the end of my ninety days leave, I felt that I simply could not return to the bank, and after consultation with my psychologist and my attorney, I resigned.

g. Before I declined early retirement, my relationship with Harry Kimball had been uniformly pleasant and cordial. After March, 1988, the pleasantness was replaced by an attitude of cold, distant formality.

h. When Alpha Accounts were introduced, there was a contest, of sorts, to enlist new accounts. Two of my children opened Alpha accounts at other branches, and Mr. Kimball refused to give me credit for them. I discussed this matter with Jerry Andrews, who said that he considered it "all one Bank of America" and that I should have been given credit.

i. In preparation for this litigation and in opposition to the motion, I have requested statements from several friends of mine who are still employed at the bank. In every instance, the friend was sympathetic, but would not give a statement for fear that they would receive the same treatment that I had received.

We find that the conduct presented by Ms. Siddoway in her affidavit and pleadings does not rise to the level of outrageous conduct required to impose tort liability, as reflected by the cases which we have reviewed. Accordingly, defendants' motion for summary judgment as to plaintiff's claim of intentional infliction of emotional distress is granted.

## CONCLUSION

Defendants' motion for summary judgment is granted as to all of plaintiff's causes of action. Judgment shall be entered accordingly.

IT IS SO ORDERED.