Filed 7/1/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DAN POPESCU, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> APPLE INC., <br><br>     Defendant and Respondent. | H040508 <br> (Santa Clara County <br> Super. Ct. No. CV249279) |

Plaintiff Dan Popescu sued Apple Inc. (Apple) for damages after he was fired by his employer, Constellium Rolled Products Ravenswood, LLC (Constellium). He alleged that between August and October of 2011, Apple took affirmative steps to convince Constellium to terminate him in retaliation for his resistance to Apple's alleged illegal anti-competitive conduct. The court sustained Apple's demurrer to Poposecu's first amended complaint (Complaint) without leave to amend.

This appeal involves Popescu's claim for intentional interference with contractual relations (contract interference) and his claim for intentional interference with prospective economic advantage (business interference). Claims for contract interference and business interference are separate but related torts. The elements of the two claims are substantially the same, but a plaintiff alleging business interference must also show that the defendant's action "was wrongful 'by some measure beyond the fact of the interference itself.' [Citation.]" (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392 (*Della Penna*).) As a general rule, this wrongfulness element is not

required in a contract interference claim because contracts are entitled to greater protection from interference.

Among the issues we will address in this appeal are whether (1) an employee (Popescu) whose at-will employment contract is terminated as a result of a third party's (Apple's) interference must allege that the defendant's conduct was independently wrongful to state a contract interference claim; and (2) a third party's alleged anticompetitive conduct may constitute independently wrongful acts to support a business interference claim, even if the plaintiff is not directly harmed by the wrongful acts.

In our review of the sustaining of a demurrer, we must accept as true all material allegations of fact that are well-pleaded in the complaint (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 866-867), regardless of how "improbable they may be. [Citation.]" (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 (*Del E. Webb Corp.*)) Based upon this standard and the law applicable to contract and business interference claims, we conclude the trial court erred.

In sustaining the demurrer to the contract interference claim, the trial court concluded that Popescu had alleged an at-will employment agreement with Constellium, and that under *Reeves v. Hanlon* (2004) 33 Cal.4th 1140 (*Reeves*), Popescu could not state a contract interference claim as a matter of law. As to the business interference claim, the court held that Apple's alleged anticompetitive conduct did not constitute an independently wrongful act supporting Popescu's claim because it was not "designed to, and [did not] actually cause interference with the economic relationship" between Popescu and Constellium.

We will conclude that the trial court correctly found that Popescu had alleged an at-will employment agreement. But the court then erroneously interpreted and applied *Reeves* as compelling the conclusion that Popescu "cannot state a claim for intentional interference with contract." *Reeves*, however, concerned a type of claim that is not at

2

issue here—a claim by a former employer whose at-will employee was hired away by a new employer. Because of the dual policy concerns of employee mobility and the promotion of legitimate competition, the California Supreme Court held in *Reeves* that the former employer had to show that the new employer's conduct in recruiting and hiring its at-will employee was independently wrongful. (*Reeves*, *supra*, 33 Cal.4th at pp. 1149-1153.) Those same policy considerations do not exist here. This case involves an employee—not his former employer—suing a third party for interfering with his employment agreement. We thus hold that *Reeves* does not require Popescu to allege or prove as part of his contract interference claim that Apple's conduct in interfering with his at-will employment contract was independently wrongful.

We also hold that Popescu alleged the required elements of a business interference claim. As part of that claim, Popescu was not required to allege that he was directly harmed by an independently wrongful act so long as he alleged (as he did) that Apple's wrongful act interfered with his economic relationship with Constellium.

Because the demurrer to both causes of action should have been overruled, we need not address Popescu's contention that the trial court abused its discretion by denying leave to amend. We will reverse the judgment with directions that the court vacate its prior order and enter a new order overruling the demurrer to both causes of action.

PROCEDURAL BACKGROUND

### I. *Complaint*

On July 9, 2013, Popescu initiated this action against Apple, alleging contract interference and business interference claims. Apple filed a demurrer to the initial pleading. Apple's demurrer was not heard by the court because, in response to the demurrer, Popescu filed an amended pleading, the Complaint, that is at issue in this appeal.

3

Popescu, an Arizona resident, alleged[1] that he is "an aluminum engineering manager who developed cutting edge alloys for high-tech customers." The gist of his action is that he "objected to Apple's unlawful trade practices," and that Apple therefore "convinced [his] employer to terminate him for cause on a trumped up basis," thereby "blackball[ing] Popescu from his profession."

In 2000, Popescu was working for Alcoa, Inc. (Alcoa). He was hired that year by Algroup Alusuisse (Algroup), an aluminum supplier that is Alcoa's largest competitor. Algroup hired Popescu because he had expertise "in marketing value-added aluminum substrates directly to end users in high-tech industries." Algroup and Popescu entered into an employment agreement, which included the following provision for Popescu's benefit: " 'An extended separation support package (as an exception to current policy) which would provide you with up to twelve months of base salary and medical/dental coverage through paid COBRA, as well as outplacement services, should your employment terminate for any reason other than misconduct or resignation.' " Algroup was acquired by Alcan Corporation (Alcan) in 2001.

Popescu alleged that he was "a stellar and highly valued employee [who] survived a series of corporate transactions" that resulted in his employment by Constellium. In a June 2009 written employment agreement, Constellium reaffirmed Popescu's severance provision in his prior agreement with Algroup: " 'Algroup Severance Plan: Provisions of the Algroup severance, offered to you at the time of your employment with Algroup, will continue to be honored, up to one year's severance pay while unemployed, COBRA benefits (if not eligible elsewhere), outplacement services and unused earned vacation.' "

---

[1] A demurrer admits the truth of all facts properly pleaded. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.) Accordingly, we will sometimes refer to the allegations in the Complaint without using the prefatory phrase "Popescu alleged" to avoid undue repetition of that phrase.

Popescu alleged that he received performance reviews from Alcan and Constellium that were "exemplary." His employer used a scoring system that rated him as " 'Very Successful' or 'Exceptional.' " During his last review in February 2011, Constellium designated Popescu as being in "the very highest 'Critical Resource' category." The next month, it designated him as the lead employee in pursuing a relationship with Apple in which it was looking "to expand the aluminum look and design of the MacBook and iPad to its iPhone. Popescu performed superbly."

By early 2011, Apple had determined it would "replace the stainless steel iPhone body with a thinner and lighter extruded, anodized aluminum alloy." Apple approached Constellium to develop an alloy with "specifications [that] were very demanding and required state of the art expertise and technology." In March 2011, the business unit president of Constellium Global ATI (of which Constellium is a subdivision) designated Popescu to lead in the pursuit of a relationship with Apple in the latter's goal of using an aluminum alloy for its iPhone products. Popescu was designated the project lead because of his "expertise and performance."

Popescu and a team of engineers from Constellium commenced work on the Apple custom alloy project. Between April and August 2011, Popescu oversaw the project, which involved Apple engineers and managers in California, Constellium's research and development center in France, and Constellium's Swiss-based manufacturing unit. Apple sought and obtained a large degree of information from Constellium, including its trade secrets regarding aluminum alloy manufacturing formulas and processes. Constellium, through Popescu, also gave Apple samples of its extruded custom alloy and other non-custom alloys.

While development was progressing, Apple insisted that Constellium sign a " 'Development Agreement' " containing "restrictive terms," including provisions that (a) Apple was not obligated to purchase any developed products or to use Constellium as its supplier, and (b) Constellium, for an effective period of five years, "would [be]

5

precluded . . . from supplying alloy to any manufacturer of consumer electronics." Apple advised Constellium that Constellium's competitors (other elite aluminum alloy suppliers) had already signed such an agreement. Popescu objected to the agreement and refused to sign it on Constellium's behalf.

Popescu alleged that he subsequently attended a meeting with Apple in Cupertino on August 30, 2011. The Apple engineers with whom Popescu had worked for months were silent, while their superiors, who were new to the project, led the meeting and "were visibly upset that the nearly complete custom alloy had outpaced the execution of the Development Agreement." Apple representatives insisted that Constellium sign the Development Agreement, which included an additional restrictive term that required Constellium to transfer its intellectual property interests in the custom aluminum alloy to Apple. Popescu again refused to sign the agreement on behalf of Constellium.

Popescu alleged that Apple wanted to use the executed Development Agreement to restrict competition in the smartphone market. He alleged that by "lock[ing] up [the elite aluminum] suppliers with the [R]estrictive Development Agreement, Apple would be free to develop . . . its own extruded alloy body for the iPhone 5," and to prevent its competitors from developing a smartphone with a comparable aluminum alloy body. "Apple saw Popescu as an obstacle to the Development Agreement, so he was an obstacle to the larger scheme to restrict competition in smartphones."

Popescu also alleged that, during the August 30 meeting, he had inadvertently activated the recording feature of his Livescribe Smartpen (the recording incident). Apple's attorney noticed that the meeting was being recorded, confiscated the Smartpen, and the meeting continued. After the meeting, Apple insisted that Constellium commence an investigation into the recording incident. Apple also requested that Constellium terminate Popescu, but his supervisors resisted. Apple then appealed to the executive management of the private equity firm that owned Constellium, after which Popescu was terminated for cause. Popescu alleged that Apple "used the recording

6

incident to leverage both [his] termination and Constellium's execution of the Development Agreement." Apple's action allegedly prevented Popescu from obtaining other employment in the aluminum alloy industry. At the time he was terminated on October 28, 2011, Popescu earned more than $200,000 per year, and he intended to work at Constellium for at least 10 more years, until he retired.

After Popescu was terminated, Constellium signed the Development Agreement. Constellium was "the last of the elite aluminum suppliers to sign the Development Agreement and, thus, the last supplier capable of producing an extruded alloy case equal or superior to Apple's extruded . . . iPhone 5 case." Popescu alleged that as a result of his termination and Constellium's execution of the Development Agreement, Apple was able to misappropriate Constellium's aluminum alloy trade secrets. He alleged that the Development Agreements signed by Constellium and other elite aluminum suppliers— which agreements were "naked output contracts . . . in which a firm bargains for another's entire output on the condition that the seller does not deal with the firm's rivals"—had anticompetitive effects in the global marketplace because "Apple's competitors [were] denied a potentially efficiency-increasing resource while the public [was] denied a better, more durable smartphone." He also alleged that Apple's anticompetitive actions negatively impacted elite aluminum suppliers, consumer electronics companies (including smartphone manufacturers), and smartphone consumers.

In the first cause of action, Popescu alleged a claim for contract interference. He claimed he had an employment contract with Constellium that restricted its ability to terminate him and therefore he was not an at-will employee when he was terminated. He also alleged that (1) Apple was aware of his contract; (2) it intentionally induced Constellium to terminate his employment; (3) as a result of Apple's actions, Constellium terminated him, purportedly for cause, on October 28, 2011; and (4) he was damaged as a result of Apple's conduct.

7

In the second cause of action, Popescu alleged a purported claim for business interference. He claimed (1) he had an employment relationship with Constellium under which there was a probability he would receive future economic benefits; (2) he had intended to work for at least 10 more years at the time his employment was terminated; and (3) had it not been for Apple's actions, it was extremely likely he would have stayed employed with Constellium as he had planned. He also alleged that (1) Apple was aware of his employment relationship with Constellium, (2) Apple intentionally induced Constellium to terminate his employment, and (3) Constellium terminated him, purportedly for cause, on October 28, 2011, as a result of Apple's actions.

Popescu claimed in the second cause of action that Apple's actions were independently wrongful because (1) the Development Agreement was a contract in restraint of trade in violation of the Sherman Act (15 U.S.C. § 1) and Business and Professions Code section 16600; (2) Apple engaged in a trust to restrict trade and prevent competition in violation of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.); (3) Apple's conduct was a scheme to misappropriate Constellium's trade secrets in violation of Civil Code section 3426; (4) Apple's conduct constituted intentional interference with Popescu's contract with Constellium; and (5) Apple's conduct violated Business and Professions Code section 17200 et seq., in that it (a) threatened an incipient violation of antitrust laws or a violation of the policy and spirit of the laws, (b) violated Business and Professions Code section 16600, (c) was an unfair business practice, (d) was a deceptive business practice, (e) was an unlawful business practice, and (f) included implementation of the Development Agreement which contained unconscionable terms.

*II.    The Demurrer*

Apple filed a demurrer to the Complaint under Code of Civil Procedure section 430.10,[2] asserting that the first and second claims failed to state facts sufficient to constitute causes of action (§ 430.10, subd. (e)) and were uncertain (§ 430.10, subd. (f)). Apple urged that the court sustain the demurrer without leave to amend.

The court sustained the demurrer without leave to amend.  In a lengthy order filed October 15, 2013, the court reasoned, among other things, that Popescu failed to state a cause of action (1) for contract interference because his allegations demonstrated he was an at-will employee, and (2) for business interference because he had not alleged that Apple, in allegedly taking action to encourage Constellium to launch an investigation into the recording incident that resulted in Popescu's termination, had committed an independently unlawful act.  Judgment was entered in favor of Apple.

DISCUSSION

*I.    Applicable Law and Standard of Review*

We perform an independent review of a ruling on a demurrer and decide de novo whether the challenged pleading states facts sufficient to constitute a cause of action. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)  "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules.  'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.  [Citation.]  We also consider matters which may be judicially noticed.'  [Citation.]  Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]  When a demurrer is sustained, we determine whether the complaint states

---

[2] Further statutory references are to the Code of Civil Procedure unless otherwise stated.

9

facts sufficient to constitute a cause of action.  [Citation.]"  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; see also *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1075; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he [or she] describes the defendant's conduct.  A demurrer tests only the legal sufficiency of the pleading."  (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213.)  "[T]he facts alleged in the pleading are deemed to be true, however improbable they may be.  [Citation.]" (*Del E. Webb Corp.*, *supra*, 123 Cal.App.3d at p. 604; see also *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 (*Alcorn*) [court reviewing propriety of ruling on demurrer is not concerned with the "plaintiff's ability to prove . . . allegations, or the possible difficulty in making such proof"].)

On appeal, we will affirm a "trial court's decision to sustain the demurrer [if it] was correct on any theory.  [Citation.]"  (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808, fn. omitted.)  Thus, "we do not review the validity of the trial court's reasoning but only the propriety of the ruling itself.  [Citations.]"  (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757.)

II.     Order Sustaining Demurrer To Contract Interference Claim

        A.     Background

Five elements must be alleged to support a claim for intentional interference with contractual relations (contract interference).  They are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126

10

(*PG&E*).)  It is not a requirement that "the defendant's conduct be wrongful apart from the interference with the contract itself.  [Citation.]"  (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 (*Quelimane*).)  Furthermore, a plaintiff need not establish that the primary purpose of the defendant's actions was to disrupt the contract.  The tort is shown even where " 'the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his [or her] action.' "  (*Ibid.*, quoting Rest.2d Torts, § 766, com. j, p. 12.)

On its face, the Complaint alleges facts demonstrating each of the five elements of a contract interference claim.  But the trial court held that (1) the allegations of the Complaint demonstrated that Popescu had an at-will employment relationship with Constellium, and (2) because Popescu was an at-will employee, he "cannot state a claim for intentional interference with contract."  In reaching this conclusion, the court cited *Reeves*, *supra*, 33 Cal.4th 1140.

Popescu claims on appeal that he was not an at-will employee, and that in any event, an at-will employee is not barred under *Reeves*, *supra*, 33 Cal.4th 1140 from asserting a contract interference claim.  Apple responds that the allegations of the Complaint demonstrated that Popescu had an at-will employment relationship with Constellium, and that the trial court correctly held that Popescu's contract interference claim was barred under *Reeves*.  Apple argues in the alternative—relying on *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503 (*Applied Equipment*)—that because it "was not a stranger to [Popescu's] employment relationship with Constellium," it was immune from suit for intentional interference with that contractual relationship.

B.     Apple's Claim It Was "Not a Stranger" to the Contract

In *Applied Equipment*, our high court addressed whether a contracting party may be held liable in tort for conspiracy to interfere with its own contract.  (*Applied*

11

*Equipment*, *supra*, 7 Cal.4th at p. 507.) The court said it could not. It concluded that the imposition of tort liability upon a contracting party would "[(1)] illogically expand[] the doctrine of civil conspiracy by imposing tort liability for an alleged wrong—interference with a contract—that the purported tortfeasor is legally incapable of committing; and (2) . . . obliterate[] vital and established distinctions between contract and tort theories of liability by effectively allowing the recovery of tort damages for an ordinary breach of contract." (*Id.* at p. 510.) The court noted that "California recognizes a cause of action against *noncontracting parties* who interfere with the performance of a contract." (*Id.* at p. 513, original italics.) But in rejecting the imposition of tort liability upon a breaching party to the contract, the court held: " 'While the imposition of liability in tort upon the non-party interferer may be justified in all cases for his [or her] intentional disruption of the contractual relation, the party who merely breaches his [or her] contract should in all cases be exposed only to contractual liability as he [or she] has not assumed the role of an intentional interferer. To impose tort liability upon the contract breaker because of the involvement of a third person (when liability is limited to contract damages when the contract breaker is acting alone) undermines the policies which have developed limited contractual liability.' [Citation.]" (*Id.* at p. 517.)

Apple relies on *Applied Equipment* to argue it has no liability for contract interference because, "while [it] was not [Popescu's] employer, [Apple nevertheless] [']was not a stranger['] to his 'at-will' employment" arrangement with Constellium. Apple contends that Popescu alleged that Apple "contracted with Constellium to develop a proprietary aluminum extruding process. [Citation.] This research and development [process] would represent a significant investment of time and resources by Apple. Apple therefore had a legitimate economic interest in making sure the individuals Constellium staffed the project with would not cause Apple any harm." Apple relies on the following language in *Applied Equipment*: " 'It has long been held that *a stranger to a contract* may be liable in tort for intentionally interfering with the performance of the

12

contract.' [Citation. ¶] However, consistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with contract does not lie against a party to the contract. [Citations. ¶] Applied's conspiracy theory is fundamentally irreconcilable with the law of conspiracy and the tort of interference with contract . . . . One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Applied Equipment*, *supra*, 7 Cal.4th at pp. 513-514, fn. omitted, original italics.)

We do not read the foregoing language from *Applied Equipment* (as asserted by Apple) to immunize a noncontracting party from tort liability because the noncontracting party has a "legitimate interest in the scope or course of the contract's performance." The plaintiff there, Applied Equipment (Applied), alleged that the codefendants (Litton Saudi Arabia Limited [Litton] and Varian Associates Inc. [Varian]) were both liable for conspiracy to interfere with two Applied contracts—a subcontract with Litton and a purchase order with Varian. (*Applied Equipment*, *supra*, 7 Cal.4th at p. 508.) The issue was whether a *contracting party* could be found liable for conspiring with a third party to deprive the plaintiff of the benefits of its contract—namely, whether (1) Litton could be liable in tort for conspiracy with Varian in connection with the breach of the Applied/Litton subcontract, and (2) Varian could be liable in tort for conspiracy with Litton in connection with the breach of the Applied/Varian purchase order. The court did not address whether a tort claim for contract interference or conspiracy could be made against a *noncontracting party* who had a "legitimate interest" in the contract, let alone hold that such a claim could never be asserted as a matter of law. Cases are not authority for propositions not considered. (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680.)

Dictum in *Applied Equipment* suggests a conclusion adverse to Apple's position. In the opinion's penultimate paragraph, the court noted that, since the plaintiff alleged the disruption of two contracts with two different contracting parties, "[n]othing we have said suggests that Litton may not be held liable for direct interference with the Applied Equipment/Varian purchase order (to which it was not a party) or that Varian may not be held liable for direct interference with the Applied Equipment/Litton subcontract (to which it was not a party), provided that each of the elements of the tort of interference with contract is satisfied." (*Applied Equipment*, *supra*, 7 Cal.4th at p. 521, fn. omitted.) We thus conclude that the "stranger to a contract" language (*id.* at p. 513)—which immediately follows the high court's statement that *noncontracting* parties may be held liable for interference with a contract—is used as a synonym for "noncontracting party."

An extension of *Applied Equipment*'s holding to immunize a third party from tortious interference claims simply because the third party asserts some economic or other interest in a contract would significantly undercut the tort itself and the public policy underlying it. As noted recently by the Ninth Circuit Court of Appeals: "To shield parties with an economic interest in the contract from potential liability would create an undesirable lacuna in the law between the respective domains of tort and contract. A party with an economic interest in a contractual relationship could interfere without risk of facing either tort or contract liability. This result is particularly perverse as it is those parties with some type of economic interest in a contract whom [*sic*] would have the greatest incentive to interfere with it. Such a result would hardly serve the established goal of protecting 'a formally cemented economic relationship . . . from interference by a stranger to the agreement.' [Citation.]" (*United Nat. Maintenance, Inc. v. San Diego Convention Center, Inc.* (9th Cir. 2014) 766 F.3d 1002, 1007, quoting *Della Penna*, *supra*, 11 Cal.4th at p. 392.)

In support of Apple's position that under *Applied Equipment*, *supra*, 7 Cal.4th 503, it cannot be liable for contract interference, Apple quotes from *Marin Tug Barge, Inc. v.*

14

*Westport Petroleum, Inc.* (9th Cir. 2001) 271 F.3d 825 (*Marin Tug*): "California law has long recognized that 'an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests.' [Citation.]" (Quoting from *Marin Tug*, at p. 832.) This reliance is misplaced. *Marin Tug* was concerned with a business interference claim, not a contract interference claim. Moreover, the *Marin Tug* court did not cite *Applied Equipment* in its opinion.

We find *Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344 (*Woods*) to be instructive. In *Woods*, the plaintiffs, employees of Fox Family who held stock option rights by contract, sued their employer's majority shareholder (a nonparty to the stock option contracts) for interference with contractual relations. (*Id.* at pp. 347-348.) The trial court sustained the defendant's demurrer to the contract interference claim because the defendant "was not a stranger to the contracts." (*Id.* at p. 349.) But the appellate court reversed, rejecting the defendant's contention—similar to Apple's here—that under *Applied Equipment*, *supra*, 7 Cal.4th 503, a noncontracting party that is not a stranger to the contract and that has some interest in the contract is immune from a contract interference claim. (*Woods*, *supra*, 129 Cal.App.4th at pp. 352-353.) The *Woods* court noted: "When *Applied Equipment* did use the term 'stranger to a contract,' it did so interchangeably with the terms 'noncontracting parties' [citation] and 'third parties.' [Citation.]" (*Id*. at p. 353.) Accordingly, the appellate court held that *Applied Equipment* should not be read "as holding[] that persons or entities with an ownership interest in a corporation are automatically immune from liability for interfering with their corporation's contractual obligations. [Citations.]" (*Woods*, at p. 353; see also *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 963-964 [corporate defendant that acquired entity with existing license agreement not immune from suit for interference with that agreement under theory it was not a stranger to it; " 'a stranger,' as used in *Applied Equipment*, means one who is not a party to the contract or an agent of a party to the contract"].)

15

Apple also cites *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594 (*Mintz*) in support of its position. There, the plaintiff, an insured under a health insurance plan (PERS Plus) which was issued and funded by CalPERS, sued Blue Cross of California (Blue Cross), the administrator of the plan. The claims arose out of the denial of insurance coverage for a requested treatment Blue Cross deemed "investigational." Blue Cross advised the plaintiff of his right to appeal the decision by asking for another review, but it did not advise him that he had a right under his policy "to request an independent external review" of the decision. (*Id.* at p. 1600.) In his suit, the plaintiff alleged, among other things, interference with contractual relations. (*Ibid.*) The plaintiff appealed from a dismissal entered after a demurrer was sustained. (*Id.* at p. 1602.) On appeal, the court, citing *Applied Equipment*, *supra*, 7 Cal.4th at page 513, noted that "only 'a stranger to [the] contract' may be liable for interfering with it. [Citation.]" (*Mintz*, at p. 1603.) The court held that Blue Cross could not be sued for interference with the insurance contract for which it acted as administrator because (1) the insurance contract expressly identified Blue Cross as the agent for CalPERS in administering the contract (*ibid.*); and (2) "it is settled that 'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract.' [Citations.]" (*Id.* at p. 1604, quoting *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24.)

*Mintz* is distinguishable. Apple was not mentioned—as a named agent or otherwise—in Popsecu's employment contract. Nor did Apple act on behalf of Constellium in connection with the employment agreement. Thus, Apple's relationship to the agreement was wholly tangential. Apple nonetheless describes itself as having "a legitimate economic interest in making sure that individuals Constellium staffed the project with [i.e., Popescu] would not cause Apple any harm." While we do not question the result in *Mintz*—that a defendant is immune from a contract interference claim because it was serving *as an agent/administrator* of a contracting party—it cannot be

16

read to support Apple's view that any noncontracting defendant that can articulate an interest in an interfered-with contract is immune from tort liability. (See *Powerhouse Motorsports Group, Inc. v. Yamaha Motor corp., U.S.A.* (2013) 221 Cal.App.4th 867, 883-884 [motorcycle manufacturer/franchisor could not claim "not a stranger" immunity to claim for interference with contract for sale of dealership by franchisee to third party].)

Apple also relies on *Warwick v. University of the Pacific* (N.D. Cal. 2010), 2010 WL 2680817 [2010 U.S. Dist. LEXIS 67107] (*Warwick*). In *Warwick*, the plaintiff was an independent contractor panel attorney with a California Parole Advocacy Program (CalPAP) operated by the University of the Pacific (UOP). (*Id.* at p. ** [*2].) The program arose out of a court-ordered injunction requiring the state to establish a program providing attorneys for parole revocation proceedings. (*Id.* at p. ** [*2].) The contract provided it was terminable at will by either party upon notice, and CalPAP retained sole discretion as to the assignment of any parolee clients to the plaintiff. (*Id.* at p. ** [*29].) After approximately six months—during which time various issues arose—the plaintiff's contract was terminated. (*Id.* at pp. ** [*3-13].) After the plaintiff sued UOP, defendants California Department of Corrections and Rehabilitation (CDRC) and various individuals moved for summary judgment. The district court granted the motion of the CDCR as to the contract interference claim because the plaintiff admitted she had an at-will contract with CalPAP. The district court observed that "[u]nder California law, a party who interferes with an at-will contract cannot be sued for interference with contract. [Citation.]" (*Id.* at p. ** [*32].) Citing *Reeves*, *supra*, 33 Cal.4th at page 1152, the court concluded that "[a]ny such claim is more properly viewed as an interference with prospective economic advantage claim. [Citation.]" (*Ibid.*)

*Warwick* does not support Apple's position here. First, in the context of a contract interference claim, *Warwick* did not hold that a noncontracting party having an economic interest in a contract is immune from tort liability for alleged disruption of a contractual relationship. Indeed, the district court did not cite *Applied Equipment*. Further, we

17

disagree with the *Warwick* court's recitation of California law as it concerns contract interference claims based upon at-will contracts. As we will discuss (see pt. II.D., *post*), we conclude that under *Reeves*, *supra*, 33 Cal.4th 1140, where an employee's at-will contract is terminated as a result of interference by a third party, the employee may assert a contract interference claim against the third party without showing that the third party committed an independently wrongful act. And, more generally, to the extent *Warwick* suggests that under California law a third party may not be held liable for interfering with a business relationship (whether or not based upon an existing contract) because the third party is not a "stranger" to that relationship and has "a substantial interest" in it, we disagree. The *Warwick* court, in support of this position, cited no California cases, instead relying on *Marin Tug*, *supra*, 271 F.3d 825. No California case has made such a sweeping pronouncement that would immunize third parties from liability for contract interference and business interference claims.

We conclude that Apple, even as a third party having some interest in the manner in which Popescu performed his employment agreement with Constellium, is not immune from tort liability for interfering with his contract. We next address whether the trial court correctly found that Popescu alleged an at-will employment relationship with Constellium, and, if so, whether his contract interference claim was precluded as a matter of law.

C.     Popescu's At-Will Employment Relationship

Under California law, it is presumed that employment with no specified term is at-will and may be terminated at any time for any lawful reason by the employer or employee. (Lab. Code, § 2922.)[3] "While the statutory presumption of at-will employment is strong . . . [Labor Code section 2922] does not prevent the parties from

---

[3] "An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month." (Lab. Code, § 2922.)

18

*agreeing* to any limitation, otherwise lawful, on the employer's termination rights. [Citation.]" (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335-336 (*Guz*), original italics; see also *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 (*Foley*) [at-will presumption may be rebutted "by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on 'good cause' "].) "The contractual understanding need not be express, but may be implied in fact, arising from the parties' conduct evidencing their actual mutual intent to create such enforceable limitations. [Citation.]" (*Guz*, at p. 336, italics omitted.) Factors that may bear upon a determination of the existence of an implied-in-fact contract and its contents include " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' [Citation.]" (*Foley*, at p. 680, quoting *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327.) The existence or nonexistence of an implied-in-fact contract under which the employee may be terminated only for good cause is generally a question of fact. (*Foley*, at p. 682; see also *Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 380.)

It is the statutory presumption in Arizona—the state of Popescu's domicile—that the relationship between employer and employee is at will. (See Ariz. Rev. Stat. § 23-1501.) Under Arizona law, an employee (except a public employee) may bring suit for wrongful discharge under only three circumstances: "(1) termination in breach of a written contract (signed by both the employer and employee or expressly included in an employment handbook) setting forth that the employment relationship shall remain in effect for a specified duration of time or otherwise expressly restricting the right of either party to terminate the employment relationship; (2) termination in violation of an Arizona statute . . . ; [or] (3) termination in retaliation for the refusal to violate the Arizona

19

Constitution or an Arizona statute." (*Bodett v. CoxCom, Inc.* (9th Cir. 2004) 366 F.3d 736, 746.)

Popescu argues that the trial court erred by failing to apply Arizona law to the issue of whether he had an at-will employment relationship with Constellium. He contends there were sufficient facts alleged in the Complaint that he was not an at-will employee under Arizona law because he alleged that his contract "restricted Constellium's ability to terminate him" and he "was not an 'at will' employee at the time of his termination on October 28, 2011."

Popescu did not make the assertion below that Arizona law applied to the determination of whether he was an at-will employee. Rather, he argued—citing *Guz*, *supra*, 24 Cal.4th 317 and *CRST Van Expedited, Inc. v. Werner Enterprises* (9th Cir. 2007) 479 F.3d 1099 (*CRST*)—that *under California law*, because his agreement restricted Constellium's ability to terminate him, he was not an at-will employee. Further, although he alleged that he was at all times a resident of Phoenix, Arizona, he did not allege the location of the execution, performance, or termination of his employment agreement with Constellium. And in his appellate briefs, Popescu fails to provide a substantive legal argument in support of his contention that Arizona law applies to the issue of whether he was an at-will employee. We conclude that since Popescu has not shown that Arizona law differs from California law on whether he was an at-will employee, there is no choice of law issue presented here. (See *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 580 [no choice of law issue presented "where the laws of the two states are identical"]; see also *Smith v. Cimmet* (2011) 199 Cal.App.4th 1381, 1397.)

Renewing its argument below, Apple argues on appeal that Popescu was an at-will employee, relying in part on *DeHorney v. Bank of America Nat. Trust & Sav. Assn.* (9th Cir. 1989) 879 F.2d 459 (*DeHorney*). The trial court likewise relied on *DeHorney* in concluding Popescu was an at-will employee.

20

In *DeHorney*, a terminated bank teller alleged, among other things, a cause of action for wrongful discharge. (*DeHorney*, *supra*, 879 F.2d at p. 460.) Under her written agreement with the bank, DeHorney acknowledged that she would not be a permanent employee " 'until a conclusion of a trial period, which shall not exceed three months (90 days), and that during such trial period, I may be released with or without cause and shall be entitled only to my salary at the agreed upon rate to the date of release.' " (*Id.* at p. 465.) The agreement also provided (in section 8) that after DeHorney became a permanent employee, she would " 'be entitled to two weeks' notice or one-half month's salary in lieu thereof in case of dismissal unless such dismissal results from [her] dishonesty, disloyalty, insubordination or other good cause.' " (*Ibid.*) The Ninth Circuit Court of Appeals agreed with the district court that the agreement demonstrated that DeHorney was an at-will employee, reasoning: "Section 8 is unmistakably clear that 'permanent employees' are not in fact permanent, but are only entitled to certain benefits upon termination, depending on whether they are dismissed for cause or without cause . . . . [W]hen DeHorney signed the contract, she agreed that Bank of America could terminate her with or without cause, so long as the bank complied with the notice and severance provisions set forth in Section 8 of the contract." (*Ibid.*; see also *Siddoway v. Bank of America* (N.D. Cal. 1990) 748 F.Supp. 1456, 1460 [following *DeHorney* in concluding that identical provisions created at-will employment contract].)

We find the reasoning in *DeHorney* persuasive. The agreement between Popescu and Constellium as pleaded here was subject to the presumption under Labor Code section 2922 that it was terminable at will. As pleaded, Constellium retained the right to terminate Popescu for any lawful reason. Thus, as was true in *DeHorney*, the fact that Constellium was obligated to pay compensation if it terminated Popescu for reasons other than his misconduct did not convert an otherwise at-will agreement into a for-cause agreement. (*DeHorney*, *supra*, 879 F.2d at p. 465; see also *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1102-1103 [rejecting contention that employer's two-

21

installment bonus program created implied contract that the plaintiff's employment would continue until date second installment was due].)

Popescu nonetheless contends he adequately pleaded that he was not an at-will employee by so averring, and by alleging that his "employment contract . . . 'restricted Constellium's ability to terminate him.' " These conclusory allegations were insufficient to support a claim based upon an alleged employment contract under which the plaintiff may be terminated only for good cause. Although a demurrer admits pleaded facts, it does not admit pleaded matters, such as Popescu's legal status as an at-will employee, that are " ' "contentions, deductions or conclusions of fact or law" ' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [demurrer admits pleaded facts]; see also *Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1645 ["demurrer does not admit the truth of argumentative allegations about the legal construction, operation, and effect of statutory provisions"].)

Accordingly, the trial court correctly concluded that Popescu had an at-will employment relationship with Constellium, not a for-cause agreement.[4]

D.. Application of *Reeves v. Hanlon*

The trial court held that since Popescu had alleged facts demonstrating he was an at-will employee, under *Reeves*, *supra*, 33 Cal.4th 1140, he could not state a contract interference claim. It therefore sustained the demurrer to the first cause of action without leave to amend. Popescu argues that the court erred because it erroneously interpreted *Reeves* as holding that an at-will employee cannot maintain a contract interference claim.

In *Reeves*, the plaintiffs, a law firm and one of its partners, alleged that the defendants, attorneys who left the firm, unlawfully lured the plaintiffs' employees to join

---

[4] Popescu below relied on *CRST*, *supra*, 479 F.3d 1099 in support of his position that he was not an at-will employee of Constellium. He does not rely on *CRST* in this appeal and, accordingly, has abandoned that argument. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.)

the defendants' new firm. (*Reeves*, *supra*, 33 Cal.4th at pp. 1145-1146.) The plaintiffs prevailed at trial. (*Id.* at pp. 1146-1147.) The Supreme Court addressed (1) a contract interference theory as it pertained to the workers who were induced to leave plaintiffs' law firm, and (2) a claim for violation of the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.). (*Reeves*, at pp. 1145-1146.) It was undisputed that the nine employees who left the law firm, including six who went to work for the defendants, were the plaintiffs' at-will employees. (*Id.* at p. 1147.) The *Reeves* court considered the correctness of "the Court of Appeal's legal conclusion that 'an employer may recover for interference with the employment contracts of its at-will employees by a third party when the third party does not show that its conduct in hiring the employees was justifiable or legitimate.' " (*Id.* at p. 1148.)

The Supreme Court noted initially that it has been recognized historically that a contract interference claim may be based upon disruption of an at-will contract under the theory that "[a] third party's 'interference with an at-will contract is actionable interference with the contractual relationship' because the contractual relationship is at the will of the parties, not at the will of outsiders. [Citations.]" (*Reeves*, *supra*, 33 Cal.4th at p. 1148, quoting *PG&E*, *supra*, 50 Cal.3d at p. 1127.) The court also noted that this principle had been applied historically to at-will employment contracts. (*Reeves*, at p. 1149.) But it observed that this state's public policy has long been "that '[a] former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of . . . his former employer, provided such competition is fairly and legally conducted.' [Citations.]" (*Ibid.*, quoting *Continental Car–Na–Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 110.) Further, the court noted that " 'it is not ordinarily a tort to hire the employees of another for use in the hirer's business,' " subject to the exception that liability will be imposed " 'if unfair methods are used in interfering in such advantageous relations.' [Citation.]" (*Reeves*, at p. 1149, quoting *Buxbom v. Smith* (1944) 23 Cal.2d 535, 547.)

Based upon these policy considerations, the court concluded that "[w]here no unlawful methods are used, public policy generally supports a competitor's right to offer more pay or better terms to another's employee, so long as the employee is free to leave." (*Reeves*, *supra*, 33 Cal.4th at p. 1151.) Accordingly, the court held: "[A] plaintiff may recover damages for intentional interference with an at-will employment relation under the same California standard applicable to claims for intentional interference with prospective economic advantage. That is, to recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act—i.e., an act 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard' [citation]—that induced an at-will employee to leave the plaintiff." (*Id.* at pp. 1152-1153, fn. omitted.)

The trial court here interpreted *Reeves*, as applied to Popescu's at-will employment relationship, as barring his contract interference claim. Apple reiterates on appeal its view that under *Reeves*, Popescu cannot assert a contract interference claim. Apple contends he can only assert "a cause of action for intentional interference with prospective economic advantage."

Even if we were to construe *Reeves* as requiring in *all circumstances* involving a claim for intentional interference with an at-will employment contract that a plaintiff must show that a defendant's conduct was independently wrongful, it would be incorrect to say that a plaintiff *as a matter of law* cannot state a contract interference claim. Our high court clearly held that a contract interference claim involving an at-will contract is viable under California law. (*Reeves*, *supra*, 33 Cal.4th at pp. 1152-1153.) But it held that a plaintiff, to establish such a contract interference claim, must plead and prove the defendant's action in inducing the at-will employee to terminate his or her employment involved the defendant's commission of "an independently wrongful act." (*Id.* at p. 1152.) The court did not hold that a contract interference claim involving an at-will

24

employment contract is not actionable under any circumstance. Rather, it concluded that a plaintiff could recover under such a claim "under the same California standard applicable to claims for intentional interference with prospective economic advantage." (*Ibid.*) In other words, our high court did not negate the contract interference claim involving an at-will employment agreement entirely; it merely subjected it to an additional "independent wrongful act" requirement. (See *Quelimane*, *supra*, 19 Cal.4th at p. 56 [noting that contract interference and business interference claims are separate and distinct torts].)

The trial court appears to have concluded that *Reeves* held that a plaintiff, *in all circumstances*, may only pursue a contract interference claim based upon an at-will employment relationship if "the defendant engaged in an independently wrongful act." (*Reeves*, *supra*, 33 Cal.4th at p. 1152.) As noted above, however, the Supreme Court based its conclusion that interference with an at-will employment relationship was not actionable without an independent wrongful act upon the dual public policy considerations of employee freedom of movement and a business's right to legitimately compete in the marketplace. (*Id.* at pp. 1149-1151.) Those underlying policy considerations are specific to the typical employment contract interference claim at issue in *Reeves*: where the defendant company (current employer) has induced an employee to breach an at-will employment contract he or she had with the plaintiff company (former employer and competitor of the defendant). By contrast, the claim here is an atypical one in which the defendant company (not a prospective employer) allegedly induced an employer (Apple's business partner, not its competitor) to breach an at-will employment agreement with the plaintiff employee. Under these circumstances, neither policy consideration that animated our high court's holding in *Reeves* is present.

Furthermore, the dispositive language in *Reeves* shows that our high court intended the "independently wrongful act" requirement to apply to the specific circumstances of that case: "[T]o recover for a defendant's interference with an at-will

25

employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act . . . *that induced an at-will employee to leave the plaintiff.* Under this standard, a defendant is not subject to liability for intentional interference *if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment.*" (*Reeves, supra*, 33 Cal.4th at pp. 1152-1153, fn. omitted, italics added.)

We hold that *Reeves*'s additional requirement of pleading and proof of an independently wrongful act in contract interference claims involving at-will employment contracts does not apply where, as here, the employee is the alleged victim of a third party's conduct in inducing its business partner to terminate his or her employment contract. (See Chin et al., Cal. Practice Guide Employment Litigation (The Rutter Group 2015) ¶5:525, p. 5(I)-69 [noting that *Reeves* involved suit by employer against competitor, and may not apply to employee suits against third parties who induce termination of his or her employment].) Accordingly, since Popescu alleged each of the five elements of a contract interference claim (*PG&E, supra*, 50 Cal.3d at p. 1126), it was error to sustain the demurrer to the first cause of action.

III. *Order Sustaining Demurrer to Business Interference Claim*

A. Applicable Law

The elements of the tort of intentional interference with prospective economic advantage (business interference) are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of that relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. [Citation.]" (*Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6.) The business interference tort "is considerably more inclusive than actions based on contract or interference with contract, and is thus not dependent on the existence of a valid contract." (*Buckaloo v.*

26

*Johnson* (1975) 14 Cal.3d 815, 826-827, disapproved on other grounds in *Della Penna*, *supra*, 11 Cal.4th at p. 393, fn. 5.)

Although business interference is related to contract interference, our high court has noted that a distinction must be made between the two, and "a greater solicitude [must be afforded] to those relationships that have ripened into agreements." (*Della Penna*, *supra*, 11 Cal.4th at p. 392.) Based upon this distinction, a plaintiff alleging business interference must also plead and prove "that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.' [Citation.]" (*Id.* at p. 393, fn. omitted; see *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1154 (*Korea Supply*) [noting that *Della Penna*, rather than overruling authority identifying five elements of claim, "merely clarified the plaintiff's burden as to the third element"].)

The Supreme Court in *Della Penna* expressly declined to provide more detail as to the exact definition and scope of the wrongfulness component of a business interference claim. (*Della Penna*, *supra*, 11 Cal.4th at p. 393.) But in *Korea Supply*, *supra*, 29 Cal.4th at page 1159, the court explained that wrongful conduct is sufficient to support a business interference claim if it is proscribed by "some constitutional, statutory, regulatory, common law, or other determinable legal standard" where it amounts to "independently actionable conduct." The court explained that this requirement serves to "distinguish[] lawful competitive behavior from tortious interference." (*Ibid.*) It also clarified the intent element of the tort, concluding that a plaintiff is not required to plead and prove a defendant's specific intent to disrupt the plaintiff's prospective economic advantage. Rather, the plaintiff may either plead specific intent, or, alternatively, "plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." (*Id.* at p. 1154.)

27

B. Demurrer Should Have Been Overruled

The trial court concluded that Popescu failed to state facts sufficient to constitute a cause of action for business interference. It noted that the wrongful acts alleged by Popescu consisted of Apple's "misappropriation of trade secrets from Constellium through the execution of a [Constellium/Apple] Development Agreement . . . , negatively impacting competition, and [Apple's] 'insistence [that] Constellium launch[] an investigation into the recording incident . . . to get Popescu terminated for cause . . . .' " The trial court reasoned that Popescu lacked standing to assert a trade secrets misappropriation claim, and that "the alleged misappropriation of trade secrets and wrongful inducement to enter into the Development Agreement . . . is [*sic*] not alleged to have been designed to disrupt the economic relationship between [Popescu] and Constellium, actually disrupting that economic relationship or proximately causing economic harm to [Popescu]." The trial court therefore held that Popescu had failed to state a business interference claim, because neither Apple's alleged conduct directed toward Constellium, nor its insistence that Constellium investigate the recording incident, satisfied the "independent wrongful act" requirement.

Popescu contends he alleged each of the required elements of a business interference claim. He argues that Apple's alleged "acts [of] pressuring Constellium to terminate [him] were . . . independently wrongful because they were necessary elements in [Apple's] unlawful scheme to misappropriate trade secrets by fraud and false pretenses, to induce the execution of a Development Agreement that violates state and federal antitrust laws, and to violate California's Unfair Business Practices Act. [Citations.]"

Initially, we address Apple's position that Popescu's claim was not actionable because "Apple had a protectable legitimate interest in [Popescu's] employment with Constellium. [Citations.]" In making this argument, Apple refers to its argument in connection with the contract interference claim, again citing, among other authorities,

28

*Warwick*, *supra*, 2010 U.S. Dist. LEXIS 67107, and *Marin Tug*, *supra*, 271 F.3d 825. For the reasons already stated in part II.B., *ante*, we conclude that Apple cannot claim immunity to a tort suit for alleged interference with Popescu's employment relationship with Constellium founded upon a theory that Apple is "not a stranger" to that employment relationship.

Next, Apple argues that Popescu did not allege any conduct that was independently wrongful because "[t]here is simply no law prohibiting an individual or entity from reporting an employee's unlawful conduct to his/her employer." By itself, Apple's conduct as alleged by Popescu of requesting that Constellium investigate the recording incident was not independently wrongful. And we will assume for purposes of this discussion that Apple's alleged exertion of additional pressure upon Constellium by contacting its majority shareholder to request that it terminate Popescu's employment for cause was not independently wrongful to support a business interference claim. But Popescu alleged in the Complaint that Apple's conduct in persuading Constellium to terminate him was interconnected with Apple's larger goal of requiring Constellium to sign the Development Agreement and "thereby complete its fraud of Constellium, further misappropriate its trade secrets, obtain non-trade secret information and materials, and restrict competition in the smartphone market." Apple describes these allegations as Popescu's having "concoct[ed] a fanciful anticompetitive scheme . . . result[ing] in his termination." But in considering a demurrer, the factual allegations of the Complaint are deemed to be true. (*Bader v. Anderson* (2009) 179 Cal.App.4th 775, 787.) Therefore, in determining whether Popescu alleged an independent wrongful act, we must consider not only Apple's actions made directly in conjunction with Popescu's termination, but also its interconnected dealings with Constellium in the development of custom aluminum alloys for Apple's smartphone products.

Accepting the allegations of the Complaint as true for purposes of demurrer, Popescu adequately alleged independently wrongful conduct. He alleged that Apple's

29

conduct in persuading Constellium to terminate Popescu—by removing him as an obstacle to execution of the Development Agreement—was connected with its effort to misappropriate Constellium's trade secrets. This same alleged conduct, combined with Apple's successfully obtaining the execution of similar Development Agreements from other aluminum alloy manufacturers, was alleged to have the anticompetitive purpose and effect of denying Apple's smartphone competitors an aluminum alloy resource, and denying consumers "a better, more durable smartphone." Popescu therefore alleged independently wrongful conduct by Apple, including (1) a violation of the Sherman Antitrust Act (15 U.S.C. § 10); (2) a violation of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.); (3) a Development Agreement that amounts to an unlawful restraint of trade (Bus. & Prof. Code, § 16600); (4) a violation of the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.; and (5) a scheme intending to defraud Constellium.

Apple argues at length that the alleged anticompetitive conduct directed toward Constellium should not be considered because Popescu was not directly impacted by it. Apple contends, for example, that Popescu failed to allege (1) "how Constellium's executing the Development Agreement has impacted or damaged him" in connection with the alleged Sherman Act and Cartwright Act violations; (2) "that Apple restrained [him] from engaging in his profession as required to establish a violation of [Business and Professions Code § 16600]" (3) "any facts establishing his standing to assert a trade secret misappropriation claim of himself [*sic*] or Constellium since he has not alleged he was the owner of any trade secret"; and (4) "facts establishing Apple made any actionable intentional or negligent misrepresentations to him." But Popescu is alleging a claim of business interference based upon Apple's disruption of his employment relationship with Constellium. He is not asserting his own claims of fraud, trade secrets misappropriation, or antitrust violations.

Apple's argument that Popescu has not alleged that its conduct directed toward Constellium was independently wrongful appears to be based upon the assumption that

30

the wrongful conduct must be wrongful *toward the plaintiff*. But the California Supreme Court has held to the contrary: "[W]e find no sound reason for requiring that a defendant's wrongful actions must be directed toward[] the plaintiff seeking to recover for this tort. The interfering party is liable to the interfered-with party 'when the independently tortious means the interfering party uses are independently tortious *only as to a third party*. Even under these circumstances, the interfered-with party remains an intended (or at least known) victim of the interfering party—albeit one that is indirect rather than direct.' (*Della Penna*, *supra*, 11 Cal.4th at p. 409 (conc. opn. of Mosk, J.) [citation].) In fact, 'the most numerous of the tortious interference cases are those in which the disruption is caused by an act directed not at the plaintiff, but at a third person.' [Citation.]" (*Korea Supply*, *supra*, 29 Cal.4th at p. 1163, original italics; see also *Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1405 ["interfering act [need not] be independently wrongful *as to the plaintiff*"].)

Popescu alleged in the Complaint sufficient facts which, deemed to be true (*Del E. Webb Corp.*, *supra*, 123 Cal.App.3d at p. 604), supported a business interference claim. Accordingly, the trial court erred in sustaining the demurrer to the second cause of action. Because at this stage of the proceedings we are not concerned with the "plaintiff's ability to prove . . . allegations, or the possible difficulty in making such proof" (*Alcorn*, *supra*, 2 Cal.3d at p. 496), we express no view as to the likelihood that Popescu will be able to establish that Apple intentionally interfered with his employment relationship with Constellium or that Apple's conduct was independently wrongful.

DISPOSITION

The judgment is reversed with directions to the trial court that it (1) vacate its prior order sustaining without leave to amend Apple, Inc.'s demurrer to the Complaint, and (2) enter a new order overruling the demurrer to the first and second causes of action and granting Apple, Inc. leave to answer the Complaint.

31

_____

Márquez, J.

WE CONCUR:


_____

Rushing, P.J.


_____

Mihara, J.


Popescu v. Apple
H040508

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.: CV249279

Trial Judge:                                    The Honorable Mark Pierce


Attorneys for Plaintiff and Appellant          Richard D. Schramm
Dan Popescu:                                    Amy Carlson




Attorneys for Defendant and Respondent         Todd K. Boyer
Apple Inc.:                                     Benjamin A. Emmert
                                                Robert J. Wilger
                                                LITTLER MENDELSON




Popescu v. Apple Inc.
H040508